## INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL–CIO v. FLAIR BUILDERS, INC.

No. 71–41.   Argued April 10, 1972—Decided May 30, 1972

BRENNAN, J., delivered the opinion of the Court, in which DOUG-LAS, STEWART, WHITE, MARSHALL, BLACKMUN, and REHNQUIST, JJ., joined.   POWELL, J., filed a dissenting opinon, in which BURGER, C. J., joined, *post*, p. 492.

*Bernard M. Baum* argued the cause for petitioner. With him on the brief were *Daniel S. Shulman* and *Robert H. Baum.*

*J. Robert Murphy,* by invitation of the Court, 405 U. S. 972, argued the cause and filed a brief as *amicus curiae* in support of the judgment below.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

In November 1968, petitioner brought an action in the United States District Court for the Northern District of Illinois, seeking damages and injunctive relief for an alleged breach by respondent of their collective-bargaining agreement. The complaint charged that since June 1, 1966, respondent had "continually violated" the contract by refusing to abide by any of its terms, including wage, hiring hall, and fringe benefit provisions. The agreement, which incorporated the terms of master contracts between petitioner and a local contractors' association, provided for arbitration of "any difference . . . between the parties hereto which cannot be settled by their representatives, within 48 hours of the occurrence."

The District Court dismissed petitioner's action for failure to state a claim and noted, but did not pass upon, two additional contentions of the company—"that (1) no contract was ever created, and (2) . . . if consummated, the agreement was subsequently abandoned by the union." No. 68–C–2091 (April 14, 1969) (unreported). The court suggested that the parties arbitrate the binding effect of their contract. When the company refused to arbitrate either that issue or "the subsequent issues of possible violations," petitioner filed an amended complaint to compel arbitration.

In moving to dismiss the amended complaint, respondent again denied the existence of a binding agreement and argued that the Union's delay in seeking arbitration constituted laches barring enforcement of the contract. The District Court initially denied the motion, holding that "if the employer consented to the alleged collective bargaining agreement, the laches issue should be decided by the arbitrator rather than the federal courts." Id. (Aug. 26, 1969) (unreported). But after conducting an evidentiary hearing on the scope of the ar-

bitration clause, the court entered an order dismissing the complaint. *Id.* (Dec. 4, 1969) (unreported). Though agreeing that respondent "was bound by the memorandum agreement to arbitrate labor disputes within the limits of the arbitration clause," the court found that there had been no contact between the parties from the time of the signing in 1964 until the summer of 1968. It therefore concluded that the Union was guilty of laches in seeking enforcement:

> "The master agreement contemplates initiation of arbitration proceedings if any dispute is not settled within 48 hours of its occurrence, and further provides that the Board of Arbitrators shall meet 'within six (6) days.' Yet demand for arbitration was not made in this case until April, 1969, almost five years from Flair's first alleged failure to comply with the contract and nearly three years from the inception of the alleged breach sought to be arbitrated.
>
> .    .    .    .    .
>
> "To require Flair to respond, through arbitration, to general charges of noncompliance with contract provisions allegedly beginning more than two years before this suit was filed would impose an extreme burden on its defense efforts. . . . [T]o compel arbitration would reward plaintiff for its own inaction and subject defendant to the risk of liability because of actions taken or not taken in reliance on plaintiff's apparent abandonment."

The Court of Appeals affirmed the order by divided vote. 440 F. 2d 557 (1971). Its opinion read the memorandum of the District Court to hold that the collective-bargaining agreement was still in effect and that therefore the question for decision was "whether a court may properly dismiss the complaint on the basis of laches resulting from dilatory notification of the exist-

ence of a dispute in a suit brought to compel arbitration with regard to the dispute." *Id.,* at 557–558. The court then addressed this Court's decision in *John Wiley & Sons* v. *Livingston,* 376 U. S. 543 (1964). There an employer refused to arbitrate on the ground that the union, among other things, had failed to follow grievance procedures required by the collective-bargaining agreement. We ordered arbitration, holding that "[o]nce it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *Id.,* at 557. The Court of Appeals distinguished *Wiley* on the ground that the procedural question there concerned "intrinsic" untimeliness, relating solely to the requirements of the contract. Here, on the other hand, the question was one of "extrinsic" untimeliness, based not on a violation of contract procedures but on the failure to give timely notice under the equitable doctrine of laches. Therefore, according to the court, the matter was within its province to decide, for " 'we are not indulging in the judicially unwarranted task of interpreting the collective bargaining agreement.' " 440 F. 2d, at 560, quoting *Amalgamated Clothing Workers* v. *Ironall Factories Co.,* 386 F. 2d 586, 591 (CA6 1967). We granted certiorari. 404 U. S. 982 (1971).

Petitioner contends that the Court of Appeals erred in limiting *Wiley* to cases of "intrinsic" delay because the issue of delay, whether "intrinsic" or not, "necessarily involves a determination of the merits of the dispute and bears directly upon the outcome and is accordingly for an arbitrator and not the federal court to decide." Brief for Petitioner 21. In other words, petitioner argues that even if the parties have not agreed to arbitrate the laches issue, *Wiley* requires that the arbitrator resolve

the question as an integral part of the underlying contract dispute.

We need not reach the question posed by petitioner, for we find that the parties did in fact agree to arbitrate the issue of laches here. Although respondent denies that it ever signed a binding contract with petitioner, the District Court found to the contrary and held that the company "was bound by the memorandum agreement to arbitrate labor disputes within the limits of the arbitration clause." That clause applies to "any difference," whatever it may be, not settled by the parties within 48 hours of occurrence. There is nothing to limit the sweep of this language or to except any dispute or class of disputes from arbitration. In that circumstance, we must conclude that the parties meant what they said— that "any difference," which would include the issue of laches raised by respondent at trial, should be referred to the arbitrator for decision.* The District Court ignored the plain meaning of the clause in deciding that issue.

Of course, nothing we say here diminishes the responsibility of a court to determine whether a union and employer have agreed to arbitration. That issue, as well as the scope of the arbitration clause, remains a matter for judicial decision. See *Atkinson* v. *Sinclair Refining Co.*, 370 U. S. 238, 241 (1962). But once a court finds that, as here, the parties are subject to an agreement to arbitrate, and that agreement extends to "any difference" between them, then a claim that

---

*Respondent's attorney admitted as much in the hearing before the District Court. Though contending that the binding effect of the contract was an issue for the court, and not the arbitrator, he agreed that "laches is another thing. I can go along on this being an arbitrable question, I suppose, if you have got a contract . . . ." App. 93.

particular grievances are barred by laches is an arbitrable question under the agreement. Compare *Iowa Beef Packers, Inc.* v. *Thompson,* 405 U. S. 228 (1972). Having agreed to the broad clause, the company is obliged to submit its laches defense, even if "extrinsic," to the arbitral process. The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, dissenting.

Through the exercise of formal logic the majority reaches a result that I believe is unjust. A full statement of the facts is necessary to put this case in proper perspective. Flair Builders, Inc. (Flair), is a small independent construction firm. The International Union of Operating Engineers, Local 150, AFL–CIO (the Union), had a master collective-bargaining agreement in effect with many contractor associations in Flair's area. On May 12, 1964, the Union and Flair signed a memorandum agreement which adopted the terms of the then-existing master bargaining agreement. The memorandum provided that Flair would be bound by any future master agreement entered between the Union and the contractor associations. Flair had only *one* employee at the time it signed the memorandum agreement with the Union. This employee joined the Union, but left Flair's employment about two weeks later. His job was filled successively by employees who operated the only piece of equipment owned by Flair. None of these successor employees belonged to the Union.

In the ensuing years, Flair prospered and added a modest amount of additional equipment. By 1967 it owned four pieces. Throughout the period from May 1964 until the summer of 1968, Flair operated all of its equipment with nonunion employees. During this period of more

than four years, Flair heard nothing whatever from the Union.

In 1966, without Flair's knowledge, the Union and the contractor associations entered into a new master agreement which contained a provision that: "Should any difference arise between the parties hereto which cannot be settled by their representatives, within 48 hours of the occurrence, such difference shall be submitted to arbitration." It further provided that the arbitrators should meet within six days after it was determined that the dispute could not be settled. Although Flair was not a party to the new 1966 master agreement, and received no notice of its execution from the Union, the District Court determined that Flair was "bound" by virtue of the incorporation provision in the memorandum agreement signed in 1964.

It is apparent that the Union either forgot about its 1964 agreement with Flair or considered Flair's small operation to be of no consequence. For a long time everyone seemed happy, and things went well. Then in June 1968, *four years* after the agreement was entered, a Union business agent visited Flair. This was the first such visit since May 1964. The business agent found that Flair's four employees were nonunion, and he also complained about their wages. Flair refused to recognize any obligation to the Union.

After the lapse of another five months, on November 7, 1968, the Union filed a complaint against Flair in the District Court seeking specific performance of the alleged collective-bargaining agreement and monetary damages in the amount of $100,000. Flair's motion to dismiss for failure to state a cause of action was sustained by the District Court on April 14, 1969, in a memorandum opinion which suggested that the parties arbitrate their differences. Pursuant to leave of court, the Union filed an amended complaint on June 3, 1969, alleging that on

April 18, 1969, the Union had demanded "immediate arbitration" and that Flair had refused. In its answer to the amended complaint, Flair asserted various defenses, including abandonment of the contract and laches in asserting "any purported rights or claims thereunder."

After an evidentiary hearing, the District Court concluded that the Union had been "guilty of laches by its unjustified delay in the enforcement of its contract with defendant," and dismissed the complaint. The Court of Appeals for the Seventh Circuit, with one judge dissenting, agreed that laches was a bar to the Union's belated assertion of the right to arbitrate, and affirmed the judgment of the District Court.

In its opinion today, the Court looks solely at the clause in the master collective-bargaining agreement which provided for arbitration of "any difference" between the parties, and holds:

> "[T]hat the parties meant what they said—that 'any difference,' which would include the issue of laches raised by respondent at trial, should be referred to the arbitrator for decision." [1]

---

[1] It should be noted that this language was added to the master contract in 1966 without the knowledge of Flair, at a time when it had every reason to believe that the Union—from which it had heard nothing for more than two years—had abandoned the initial memorandum agreement of May 12, 1964. Flair had no union employees, and had received no demands or notices of any kind from the Union. But whatever the situation may have been in 1966, the subsequent history of this remarkable performance corroborates the view that neither Flair nor the Union was conscious of the existence of a collective-bargaining agreement or of a right to arbitrate anything.

Even after a union business agent visited Flair's jobsite in 1968 and discovered "a non-union employee operating a piece of equipment," no action was taken by the Union until a suit for specific performance and damages was filed some five months later. No demand was made for arbitration, and no claim of any right to arbitration was made in the original complaint. The District Court,

Yet the phrase "any difference," if given its normal meaning in a labor contract, refers to disputes relating to hours, wages, fringe benefits, seniority, grievances, and to other issues customarily arising within the terms of a collective-bargaining agreement. I cannot believe that this language was intended to include the arbitration of an equitable defense asserted against the enforceability of the *entire* contract. Indeed, the Union itself did not construe the language to cover arbitration of this issue, as it asserted no such claim until after the District Court suggested it.[2]

But my dissent does not turn solely on an interpretation of the arbitration clause or of any other provision of the agreement. The defense of laches is equitable in nature. The customary situation in which it is invoked is where a contract *does* exist and, but for laches of one of the parties, would be enforceable. In this case, Flair relied in substance on two defenses: (i) that the 1964 memorandum agreement (the only agreement Flair ever signed) had been abandoned by the Union; and (ii) that even if it had not been abandoned and the arbitration clause was as broad as this Court construes it to be, the defense of laches was available as an affirmative defense. The essence of the latter defense is that the Union, by virtue of its conduct and Flair's reliance thereon, was estopped and precluded from enforcing any and all provisions of the contract, including the arbitration clause. This position was sustained by the courts below. The Court of Appeals correctly held:

> "The factual context of this appeal thus narrows the issue before us to the question of whether a party

---

not the Union, first suggested the possibility of arbitration. In these circumstances, and with all respect, I find no support whatever in the record for the Court's holding "that the parties did in fact agree to arbitrate."

[2] See n. 1, *supra.*

to a collective bargaining agreement which contains an arbitration clause may be so dilatory in making the existence of vaguely delineated disputes known to the other party that a court is justified in refusing to compel the submission of such disputes to arbitration." 440 F. 2d 557, 559 (1971).

The District Court, which heard the testimony of the parties, emphasized the burden imposed upon Flair by the Union's prolonged and unexplained delay and the ambiguity of its various positions:

"To require Flair to respond, through arbitration, to general charges of noncompliance with contract provisions allegedly beginning more than two years before this suit was filed would impose an extreme burden on its defense efforts. Especially is this so when, as demonstrated at the hearing, Flair understandably considered the contract to have been abandoned soon after its inception. Plaintiff has offered no explanation for its delay in enforcement; yet to compel arbitration would reward plaintiff for its own inaction and subject defendant to the risk of liability because of actions taken or not taken in reliance on plaintiff's apparent abandonment."

I am aware of the strong policy considerations in favor of the arbitration of union-management disputes. *John Wiley & Sons* v. *Livingston,* 376 U. S. 543 (1964). But neither *Wiley,* nor any other case to my knowledge, has forced arbitration upon a party in circumstances such as these, where the equitable doctrine of laches was clearly applicable and was asserted. We would be well advised to recall Chief Justice Marshall's admonition:

"[I]t is desirable to terminate every cause upon its real merits, if those merits are fairly before the court, and to put an end to litigation where it is in

the power of the court to do so." *Church* v. *Hubbart,* 2 Cranch 187, 232 (1804).

The effect of today's decision on Flair seems fairly clear. The Court's opinion imposes on this small business the "extreme burden" that the District Court found would result from requiring arbitration. Mr. Justice Cardozo once observed that litigation is a rare and catastrophic experience for the vast majority of men.[3] If Flair survives the long excursion to this Court, the arbitration that the majority requires, and a possible return to the District Court which already has ruled in its favor, it surely possesses more tenacity and better financial resources than the average small business. One may doubt whether many small businessmen would believe today's result possible.

The effect of the Court's decision also could be far reaching in the law of labor-management relations. It appears that the long-accepted jurisdiction of the courts may now be displaced whenever a collective-bargaining agreement contains a general arbitration clause similar to that here involved. If in such circumstances the affirmative defense of laches can no longer be invoked in the courts, what of other affirmative defenses that go to the enforceability of a contract? Does the Court's opinion vest in arbitrators the historic jurisdiction of the courts to determine fraud or duress in the inception of a contract? It seems to me that the courts are far better qualified than any arbitrators to decide issues of this kind. These are not questions of "labor law," nor are they issues of fact that arbitrators are peculiarly well qualified to consider. They are issues within the traditional equity jurisdiction of courts of law and issues which the courts below appropriately resolved. I would affirm the judgment of the Court of Appeals.

---

[3] B. Cardozo, The Nature of the Judicial Process 128 (1921).