504 F.2d 636
 87 L.R.R.M. (BNA) 2597, 75 Lab.Cas. P 10,382
 In the Matter of Arbitration Between LOS ANGELES NEWSPAPER
GUILD, LOCAL 69, AMERICAN NEWSPAPER GUILD,
AFL-CIO, CLC, Petitioner-Appellee,
v.
The HEARST CORPORATION, a corporation, et al.,
Respondents-Appellants.
LOS ANGELES NEWSPAPER GUILD, LOCAL 69, AMERICAN NEWSPAPER
GUILD, AFL-CIO, CLC, et al., Plaintiffs-Appellants,
v.
The HEARST CORPORATION, a corporation, Defendant-Appellee.
 Nos. 73-1742 and 73-1838.
 United States Court of Appeals, Ninth Circuit.
 Oct. 4, 1974.
 
 Charles G. Bakaly, Jr. (argued), O'Melveny & Myers, Los Angeles, Cal., for respondents-appellants in 73-1742.
 Daniel Fogel (argued), Reinhardt & Rothschild, Los Angeles, Cal., for petitioner-appellee in 73-1742 and plaintiffs-appellants in 73-1838.
 Michael K. Inglis (argued), Flint & Mackay, Los Angeles, Cal., for defendant-appellee in 73-1838.
 Before MOORE,* WRIGHT and GOODWIN, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 Two appeals are presently before us. They involve the same subject matter, they arise out of the same facts and the opinions were written and judgments were directed to be entered by the same district judge (Hon. Robert J. Kelleher). The appeals will be considered and decided together.
 
 
 2
 The parties in 'IN THE MATTER OF ARBITRATION BETWEEN LOS ANGELES NEWSPAPER GUILD, LOCAL 69, AMERICAN NEWSPAPER GUILD, AFL-CIO, CLC, Petitioner-Appellee v. THE HEARST CORPORATION, a corporation, Los Angeles Herald-Examiner, a Division of The Hearst Corporation, and Hillbro Newspaper Printing Company, a Division of The Hearst Corporation, Respondents-Appellants' (No. 73-1742) are a group of employees of The Hearst Corporation or their beneficiaries represented collectively by Petitioner-Appellee, which will hereinafter be referred to as the 'Guild.' The Hearst Corporation, Respondents-Appellants, and its Divisions, publish, print and circulate a daily and Sunday newspaper, THE HERALD-EXAMINER, and will be referred to hereinafter as 'Hearst.'
 
 
 3
 The parties in 'LOS ANGELES NEWSPAPER GUILD, LOCAL 69, AMERICAN NEWSPAPER GUILD, AFL-CIO, CLC, et al., Plaintiffs-Appellants v. THE HEARST CORPORATION, a corporation, Defendant-Appellee' (No. 73-1838) are likewise the Guild and Hearst.
 
 
 4
 The controversies stem from the rights, if any, of Hearst and the Hearst employees under two collective bargaining agreements, which had been entered into on or about January 28, 1966, by the Guild on behalf of the Hearst employees and Hearst. The agreements provided for wages, hours, working conditions, etc., covering the employees' employment. These agreements were but a continuation of similar employment agreements, containing comparable benefits, under which many of the employees had worked for a substantial number of years.
 
 
 5
 Two provisions of the agreement relating to compensation are critical to any decision adjudicating the employees' rights thereunder. Article XI, entitled 'Alternate Benefits' declared that an employee, upon reaching the age of sixty-five (65), or upon the completion of twenty-five (25) years of service, would become entitled to receive from Hearst a cash lump sum payment based upon the number of years of his service to Hearst in accordance with a certain schedule set forth therein. To receive these payments, the employees, so desiring them, had to tender their resignations and request payment. Article IV, entitled 'Dismissal Pay' (somewhat of a misnomer) provided for a cash lump sum payment to the beneficiary of any employee who died after more than six (6) months of service, the amount to be dependent on the period of service as set forth in a schedule in said Article.
 
 
 6
 No ambiguity is to be found in the terms of these Articles or in the prerequisites necessary to obtain the agreedupon payments. To Hearst and the employees they were as much a part of wages as the weekly or monthly stipend. The following facts had to be shown for entitlement under Article XI, (1) age sixty-five years (65) or over or twenty-five years (25) years or more of service, (2) resignation tender, and (3) request for payment; under Article IV, two facts (1) death and (2) six (6) months or more of service. Just as there is no ambiguity in terms, there should be no ambiguity as to performance. However, commencing in the Fall of 1967, a series of events caused this otherwise stable situation to suddenly be turned into a controversy which in bitterness and duration bids fair to rivalling the War of the Roses. For some seven years the war has raged but thus far only in a series of legal skirmishes, none of which has attacked the main issue, i.e., the rights, if any, of the employees and Hearst under the agreements. It may seem quite incongruous after seven years for the courts now to say that it is high time to resolve this issue expeditiously and with finality but since courts have been created for this purpose they should so act when the issue is presented in proper form.
 
 
 7
 A few background facts will suffice. In September 1967 the Guild notified Hearst and state and federal mediation services that it intended to terminate or modify the existing agreements which expired on December 15, 1967. In October 1967 negotiations for a new agreement[1] commenced. As of yet, however no settlement has been reached. No agreement having been reached by December 15, 1967, the Guild called a strike against Hearst, which has continued to date. However, the last seven years have not been uneventful for Hearst and the Guild.
 
 
 8
 Subsequent to December 15, 1967, employees who had reached the age of sixty-five (65) or had completed twenty-five (25) years of service, tendered their resignations and requested the payments specivied in the agreements, the beneficiaries of deceased employees also requested the provided for payments. To these requests Hearst replied that the agreements were no longer effect and accordingly rejected them, and refused to make the specified payments. Then followed a protracted series of meetings between Hearst and the Guild to discuss the matter with Hearst remaining adamant in its position that the agreements no longer applied.
 
 
 9
 At this stage must be discussed Article VII of the agreements which provides for amicable settlement (a hopedfor desideratum) of 'all grievances arising under this Agreement' (Article VII, SECTION 1). For this purpose, Grievance Committees were to be established by both the Guild and Hearst, certain formalities for the submission of grievances were set forth and in the event that arbitration was requested 'the parties shall meet to select an arbitrator to whom the grievance of the complaining party shall be submitted for final decision.' (Article VII, Section 3A).
 
 
 10
 Of particular significance to the litigations before us is the folllowing paragraph:
 
 
 11
 B. If such an arbitrator is not selected, or the party adverse to the complaining party refuses for any reason to proceed to the selection of an arbitrator, or if for any other reason an arbitrator is not selected or secured within the aforesaid five (5) day period, then the complaining party has the right to request the American Arbitration Association to proceed to the appointment of an arbitrator pursuant to the present rules of the voluntary labor arbitration tribunal of the American Arbitration Association, and the grievance shall be submitted to such arbitrator for final decision.
 
 
 12
 Although meetings between the Guild and Hearst were held during the Spring of 1968, Hearst did not alter its position that the agreements were not in effect. Finally, on June 19, 1968, the Guild by letter demanded arbitration 'of the grievances raised by its letter of March 27, 1968, relating to Hearst's refusal to pay alternate benefits' and requested by letter a meeting to select an arbitrator. This demand for arbitration was rejected by Hearst on the specific ground 'that it arises out of events subsequent to the expiration of the Guild's collective bargaining agreement . . .' Thereafter, the Guild continued to submit grievances because of Hearst's refusal to pay and continued to demand arbitration. Hearst's rejection of both demands was based upon the same grounds above specified.
 
 
 13
 At this point must be mentioned a diversionary maneuver in which the employees and the Guild engaged. Apparently feeling thwarted in their efforts to obtain payments from Hearst, they turned to the State Labor Commissioner, Division of Labor Law Enforcement of the State of California, by assigning to the State for collection their claims against Hearst. Hearings on the claims were held in the Fall and Winter of 1968 at which Hearst maintained its position that the agreements were no longer in effect.
 
 
 14
 The Commissioner found that Hearst owed the sums claimed and demanded payment of Hearst. Unable to collect from Hearst, the Commissioner attempted to file a criminal complaint against Hearst through the City Attorney of Los Angeles. The City Attorney refused to issue a criminal complaint because a contract issue was involved, and the Labor Commissioner, asserting that the claimants had a contract remedy through arbitration, refused to pursue a civil action. Thus, more than six months of time were wasted, and the claimants were still without their benefits.
 
 
 15
 All during this period (1968-1969) negotiations (so-called) were taking place between Hearst and the Guild, at which the Guild demanded payment and arbitration and Hearst rejected both.
 
 
 16
 Suspicious that the Guild might request ex parte arbitration, Hearst in writing warned the American Arbitration Association (AAA) that there was no agreement in effect and that any request to appoint an arbitrator would be invalid.
 
 
 17
 Meetings, however, continued to the end of August 1969 without tangible results. Finally, on October 3, 1969, the Guild by letter requested the appointment of an arbitrator pursuant to AAA rules. In disregard of, and in non-compliance with, its own rules, the AAA on or about October 8, 1969, appointed Thomas T. Roberts as the Arbitrator. The Arbitrator advised the Guild and Hearst that on February 3, 1970, he would hold a hearing which would relate in particular 'to the viability of the grievance, the propriety of arbitration, the procedure to be followed if there is to be an arbitration and, of course, my jurisdiction.'
 
 
 18
 The Arbitrator so circumscribed his role as to make the proceeding before him a legal nullity. Thus, in his initial letter to the parties he wrote: 'It should be clear that any appearance before me on February 3, 1970, will be in the nature of a 'special appearance.' More specifically, any appearance on that date will not constitute a recognition of my jurisdiction nor will it be deemed a waiver of available defenses relating to a lack or arbitrability.'
 
 
 19
 Hearst, to be doubly sure that its physical presence at any hearing would not be a waiver of its position that the matter was not arbitrable, specifically stated by letter that its participation 'should not be considered as a general appearance, special appearance, nor a recognition of your jurisdiction; . . ..' Furthermore, Hearst stated that its 'involvement in this arbitration should not be construed as a relinquishment of its right and intention to proceed before any appropriate tribunal to vindicate its position that this matter is not arbitrable.'
 
 
 20
 At the hearing itself on February 3, 1970, Hearst reiterated this position and added the ground that the matter was not arbitrable because the Guild had not made a timely request for the appointment of an arbitrator. To this statement the Arbitrator respondent 'that the Guild (should) understand that if we go forward this morning regarding anything that the company (Hearst) is not making a special appearance, a general appearance or a half-way between appearance.' At this and the only hearing, the issue was restricted to the timeliness of the Guild's request for the appointment of an arbitrator. No testimony was presented as to the merits of the employees' claims.
 
 
 21
 On August 12, 1970, the Arbitrator rendered Findings and Award. He addressed himself to none of the claims or grievances filed by the employees except as he said that the grievances filed under the January 28, 1966 agreement were 'not arbitrable because of the failure of the Guild to cause the appointment of an arbitrator in a timely manner as required by Article VII of the said agreement.' Thus, he challenged, sua sponte, his own appointment by the AAA and, by creating a quasi statute of limitations not in the agreement, decided that the grievances were not arbitrable-- in other words, he rejected his jurisdiction to pass upon the asserted grievances.
 
 
 22
 Frustrated by the California Labor Commission to obtain such benefits to which they may be entitled under the agreement and by the holding of the Arbitrator that their claims were not arbitrable, the beneficiaries under the agreements turned to the courts for relief.
 
 
 23
 On November 18, 1970, the Guild filed a petition to vacate the so-called Arbitrator's award. The Guild also filed an action against Hearst in the district court for breach of contract, unpaid wages, work and labor performed, money had and received and for certain declaratory relief.
 
 
 24
 Both actions came on for trial and decision before the Honorable Robert J. Kelleher, Judge. Decisions in each action were rendered under date of January 10, 1973. From the decision (Appeal No. 73-1742) vacating the so-called arbitration award and directing that arbitration proceed on the merits, Hearst appeals. From the decision (Appeal No. 73-1838) dismissing the breach of contract, etc., action on the ground that arbitration is the exclusive remedy under the agreement, the Guild appeals. These appeals will be considered on a composite basis because it would seem that together they present all questions of law and fact pertinent to a resolution of the respective rights of the parties.
 
 
 25
 So many questions of law and fact have been raised that some sifting analysis may well be made at the outset. The primary and initial question to be solved is: is the agreement in effect so as to control the rights of the parties thereto and, if in effect, what are those rights? Hearst claims that it is not and that it ceased to be operative either after its expiry date or because of the Guild's strike on December 15, 1967. The Guild, in turn, claims that the agreement was a wage contract; that the rights of the employees to the payments therein provided for became vested; and that these were not destroyed by the failure to negotiate a new contract or by strike. Subsidiary to this question is whether there is a difference between employees whose rights ripened on or before December 15, 1967, and those whose rights ripened thereafter. But all important is who is to determine whether the agreement was in effect so as to create these rights because, if there be no enforceable agreement, no rights substantive or procedural flow therefrom. The choice would appear to be limited to the courts, an arbitrator or possibly both.
 
 
 26
 The issue is not without its complexities. As the District Court pointed out in its opinion (Arbitration vacatur case) 'Hearst did '. . . not intend to relinquish its right to have this question of arbitrability resolved in any appropriate court tribunal." (Arbitration Proceedings' Transcript at 7.) The Court also referred to a pre-trial statement by Hearst's counsel that first, the Court had 'to find that the basic underlying dispute is arbitrable. That is the duty of the Court.' (Tr. Oct. 21, 1971, at 88). Although this comment may be somewhat ambiguous, i.e., is the agreement in effect and operative and is the dispute arbitrable thereunder, it is clarified by the Court's making a 'judicial determination' and adjudging that 'The contract between the parties, so far as it provides for amicable settlement or arbitration of disputes, is in full force and effect.' and that 'the grievances initiated by the Guild, based on Articles IV and XI of the collective bargaining agreements are properly arbitrable under those agreements;.' The Court kept open the opportunity for amicable settlement by ordering that the Guild and Hearst 'proceed to adjust their dispute as provided in Article VII of their agreements.' However, if such a settlement were not reached as contemplated in sections 1 and 2 of said Article, 'the parties shall have the right to proceed to have arbitrated the merits of the disputes as provided in section 3 of Article VII of their agreement.'
 
 
 27
 The Conclusions of Law give direction to the judgment. The Court concluded that 'the existence of an agreement to arbitrate a particular dispute is a matter for the Courts to decide'; that Hearst had not relinquished its right to have this issue judicially determined; that the issue of substantive arbitrability not having been determined, the Guild was precluded from unilateral initiation of arbitration; that the Arbitrator's award on procedural issues was of no effect and should be vacated. Of particular importance are the conclusions that the agreements are in full force and effect; that the grievance and arbitration provisions 'cover the alternate benefits and dismissal pay disputes' and that Hearst is bound to resolve the grievances in the manner provided by the agreements; and that the parties must proceed to adjust their dispute as provided in Article VII. A judgment to this effect was ordered.
 
 
 28
 The Court, thus, clearly answered the question: was the agreement in effect. Obviously in its opinion neither expiry date nor strike had destroyed its contractual obligations. All that remains is to determine the respective rights of the parties thereto.
 
 
 29
 On appeal (the award vacatur appeal) Hearst argues in substance that the Guild, by appearing before the Arbitrator on February 3, 1970, and litigating the procedural issue of timeliness in seeking arbitration, is bound by the award which is subject to only a limited judicial review which review does not include examining the arbitrator's determination that the Guild delayed unreasonably in appealing to the AAA and that the Arbitrator could decide sua sponte whether he could limit himself solely to the issue of the propriety of his appointment.
 
 
 30
 Our function on appeal is to pass upon alleged errors in the District Court's opinions. Vacatur of the so-called award is the ultimate issue in No. 73-1742.
 
 
 31
 The award should be vacated. The parties made their agreement under which the Guild employees worked and Hearst received the benefits of their services. The employees' rights under Articles XI and IV were an important part of their contract. For over two years Hearst rejected all demands for recognition of the employees' claims and for arbitration on the theory that no agreement was in effect. Novertheless negotiations of sorts were continuing during that period. When finally on October 3, 1970, the Guild was driven to seek unilateral arbitration, the AAA in non-conformity with its own rules appointed Arbitrator Roberts. The record discloses no facts upon which a claim of lack of timeliness can be sustained even if this had been the grievance contemplated by the agreement. All during this period it was Hearst and not the Guild which refused to recognize any duty to arbitrate.
 
 
 32
 We turn now to the Guild's action for breach of contract, etc. (Appeal No. 73-1838). The District Court dismissed this action 'since arbitration is the exclusive remedy, an action for damages in breach of contract will not lie.' The Court relied on the so-called triology[2] as enunciating a national policy of settling labor disputes by arbitration. On this appeal Hearst, despite its repeated proclamations that no agreement was in effect, supports the District Court's position that the Guild's sole remedy through 'the Arbitral Process Provided for by the Collective Bargaining Agreement.' It claims that the Guild had the right to proceed ex parte to arbitration. But even in this endeavor the Guild was frustrated by Hearst's refusal to recognize the agreement and to appear, and by the Arbitrator's acceptance of that refusal. In view of our decision affirming the District Court's vacatur decision No. 73-1742, it is unnecessary to consider what the effect of a decision might have been against a 'company ((Hearst) that) is not making a special appearance, a general appearance or a half-way between appearance.'
 
 
 33
 While there is no doubt that arbitration is the favored path to the solution of labor disputes, there still remains to the courts the duty to oversee the arbital process to ensure that the parties receive the arbitration that they bargained for. Thus, in this case the Court had jurisdiction to determine arbitrability and then to compel arbitration, IUOE Local 150 v. Flair Builders, Inc., 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972). But this supervisory function is a far cry from that of an arbitrator taking into his own hands the timeliness of his own appointment, a matter quite dehors the agreement and parenthetically quite unsupported by the facts.
 
 
 34
 It might well be that Hearst's repudiation of the agreement would have given the Guild the right to obtain a judicial determination of its rights on the theory of breach of contract. But after seven years, it is time that the merits of the controversy be decided. The question is should decision be by court or by arbitrator? Even if arbitration be not the exclusive remedy, it is the remedy for which the parties contracted and which the District Court has decreed to be the proper road to follow.
 
 
 35
 Both parties have cited hosts of cases dealing with the labor problems of other companies under other circumstances. Most of them stand for the proposition that arbitration is to be favored for a solution of labor disputes as indeed it should be if the subject matter of the disputes is put fairly before the arbitrator.
 
 
 36
 However, this court is not called upon to debate the wisdom of other decisions upon other facts. Our task is to decide the relief which should be granted upon the specific facts before us. Accordingly, we affirm the judgments of the District Court in both appeals except with one slight modification. The seven years have produced no signs of amicable settlement. No benefit will come to either party by continuing their deadlock. In colloquial terms, it is time to get on with it. Therefore, the judgment in No. 73-1742 is modified to the extent that the parties shall have the right to proceed to have the merits of their disputes arbitrated; that either party, or both, may forthwith request the American Arbitration Association to cause the appointment of an arbitrator who shall be appointed in accordance with its rules; that the arbitrator shall hear and determine the rights of the parties under the agreement including the alternate and dismissal pay benefits and any other issues properly before him; and that such appointment, hearings and determination be made as expeditiously as possible.
 
 No. 73-1838
 
 37
 In view of our decision with respect to No. 73-1742 holding that any and all grievances properly cognizable under the Hearst-Guild collective bargaining agreement be decided by an arbitrator, the judgment in No. 73-1838 is affirmed.
 
 
 
 *
 The Honorable Leonard P. Moore, Senior United States Circuit Judge, United States Court of Appeals for the Second District, sitting by designation
 
 
 [1]
 Reference is occasionally made to 'agreement' and to 'agreements.' Those words apply to the agreement which existed between Hearst, its employees and the Guild, covering the employees' employment and Hearst's obligations to them, and which defines the rights of the parties now before this Court
 
 
 [2]
 United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), and United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)