**GENERAL TEAMSTERS, CHAUFFEURS & HELPERS, LOCAL UNION NO. 249, an unincorporated association, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, by Thomas L. Fagan, Trustee ad litem, Plaintiff,**

v.

**CUSTOM DELIVERIES, INC., a corporation, Defendant.**

Civ. A. No. 78–328.

United States District Court,
W. D. Pennsylvania.

July 20, 1978.

Samuel J. Pasquarelli, Jubelirer, McKay, Pass & Intrieri, Pittsburgh, Pa., for plaintiff.

William A. Stewart, III, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., David R. Knowles, Cleveland, Ohio, for defendant.

## OPINION

SNYDER, District Judge.

This matter involves a dispute over whether the discharge of two employees of the Defendant, members of General Teamsters, Chauffers & Helpers, Local Union No. 249 (Union), were subject to binding arbitration under the terms of the labor contract. The specific dispute involved the discharge of Angelo Graziano and Gilbert Recker. The Defendant discharged them both as unsatisfactory probationers, upon the theory that Article 41 of the contract permitted this, since the Company contended the men did not have 30 *work days* of service with the Defendant. The Plaintiff

contended that the men had been employed for in excess of 30 *calendar days*, and thus were not subject to discharge except for just cause. Finding that the discharges were subject to arbitration, it will be so ordered.

### I.

Custom Deliveries, Inc. (Company) began operations on January 24, 1977 for the purpose of delivering Chrysler parts in Western Pennsylvania, Eastern Ohio, and Northwestern Virginia. Angelo Graziano was hired on January 24th and Gilbert Recker was hired on January 25th, 1977, and the contracts (the National Master Freight Agreement and the Teamster's Joint Council No. 40 Freight Division Over-the-Road Supplemental Agreement) were signed by the Company and the Union on January 31, 1977. On February 24, 1977, the Company terminated Graziano's employment, and on February 28th, Recker was terminated.[1] On February 28, 1977, a protest meeting was held by Union representatives with the Company to discuss the reason for these discharges. The Company took the position that the men were hired only on a trial basis and could be fired without cause. The Union denied there was any just cause for the firings. On March 1, 1977, the Union called a strike under a misapprehension that the contract had not as yet been signed by it.[2] On March 2nd, the Union's attorney was shown the *signed contract* containing a no strike clause and Article 41, which stated:

"A new employee shall work under the provisions of this agreement but shall be employed only on a 30 day trial basis, during which period he may be discharged without further recourse, provided, however, that the employer may not discharge or discipline for the purpose of evading this agreement or discriminating against union members."

The Union pointed to Article 47, which provided:

---

1. Prior thereto, on February 11, 1977, Company personnel held a discussion with the Union representative relative to the failure of the two men to carry out their delivery assignments within the scheduled time.

2. This misunderstanding arose because of a change in business agents and the bad communications between the old and new agent.

"The employer shall not discharge nor suspend any employee without just cause."

On the advice of counsel, the men went back to work immediately. On April 5, 1977, Graziano and Recker filed individual grievances, stating:

"I was unjustly discharged by Custom Dely. Since that time several meetings have been held and the company said they would submit the case to a committee. To this date nothing has been arranged."

A considerable delay followed, apparently as the result of discussions between counsel for the Union and the Company. Then, on November 17, 1977, the Union commenced suit in the United States District Court for the Western District of Pennsylvania at Civil Action 77–1324. In discussing the history of that action, Samuel Pasquarelli, counsel for the Union, testified at the Hearing on the Motion for Temporary Injunction held before this Court on May 8, 1978, as follows (Tr. p. 44):

"That lawsuit was settled, Your Honor, after the complaint was served. I received a call from Mr. David Knowles, who asked me what the problem was, and I related to him the fact that the company was evidently refusing to submit this matter through the grievance procedure, and Mr. Knowles and I agreed that he would write a letter to me indicating that the company would be willing to submit this matter through the grievance procedure, if I would have that lawsuit dismissed. It was set for the hearing before Judge Knox, but we then had it dismissed because I received a letter from Mr. Knowles indicating that the company would submit to the grievance procedure."

The Knowles letter of November 30, 1977, read as follows (Plf's Exhibit 15):

"Dear Mr. Pasquarelli:

As I indicated in our telephone conversation of November 28, 1977, Custom Deliveries, Inc., Oakdale, Pennsylvania, will comply with the grievance machinery set forth in the current Teamsters Joint Council No. 40 Freight Division Over-the-Road Supplemental Agreement.

With respect to the discharge of Gilbert Recker and Angelo Graziano and any grievances related thereto, Custom Deliveries, Inc. reserves the right to raise any and all procedural and substantive defenses to those grievances including, but not limited to, the untimeliness of the original grievances. Custom Deliveries, Inc. will not, however, raise as a defense the timeliness or untimeliness of the union's appeal of the matter to the Western Pennsylvania Joint Area Committee.

Sincerely yours,
/s/ David R. Knowles
David R. Knowles, Esq.

DRK:aj
cc: M. J. Kelly
P. Dietrich"

There followed, then, the following colloquy between the Court and Mr. Pasquarelli (Tr. pp. 45–47):

"THE COURT: Again, Mr. Pasquarelli, was there anything in your discussion to clarify the meaning of the letter of November 30, which says that the company reserved the right to raise any and all procedural and substantive defenses to the grievances, but not limited to the untimeliness of the original grievance. 'Custom Deliveries will not, however, raise as a defense the timeliness or untimeliness of the Union's appeal of the matter to the Western Pennsylvania Joint Area Committee.'

THE WITNESS: The only discussions Mr. Knowles and I had with regard to those procedural defenses, Your Honor, were, first of all, the Company did not want to be precluded from raising the issue that the grievances themselves were not filed in a timely fashion; secondly, they did not want to be precluded from raising the issue that these two men were, in fact, probationers who had no right to be held over as full employees.

My response to that was that I understood those were the two bases to their defense and had no objection to that. There was never any discussion, at that

time, that the matter would proceed from the Western Pennsylvania Area Committee to Eastern Conference Area Committee. In fact, my discussions with Mr. Knowles were always an attempt to try to avoid going to the Western Pennsylvania Committee, because I felt certain the matter would deadlock there and go directly to arbitration, and his reply was they wanted their day before the Western Pennsylvania Committee, which I had no objection to."

Mr. Pasquarelli continued his testimony under questioning by Mr. Orsatti:

"Q  Mr. Pasquarelli, can you identify what has been marked as Plaintiff's Exhibit 16?

A  Yes, That is the motion for discontinuance that I presented to Judge Knox after I received Mr. Knowles' letter regarding the action at 77–1324.

Q  Now, in paragraph two of that motion, it states that the parties have settled their differences, 'in that Defendant has agreed to comply with the grievance machinery set forth in the document set forth as Exhibit A to Plaintiff's complaint, with certain exceptions agreeable to the parties.'

A  That is right.

Q  What were the exceptions that you mentioned in paragraph two?

A  Well, the exceptions I was referring to there were that the company would not raise the issue that any appeals from—excuse me, that any proceedings from the initial filing of the grievance onward were not taken in a timely fashion, because, technically speaking, once the grievance was filed, if a satisfactory resolution hadn't occurred, an appeal was to be taken to the Western Pennsylvania Area Committee within a fixed time period, and, of course, that time period had long since gone by. That is really what we were referring to there."

The action pending before Judge Knox was discontinued on December 7, 1977. Mr.

Pasquarelli's testimony continued (Tr. pp. 48–49):

"Well, my next contact with Custom Deliveries was on January 9, 1978, because, after we discontinued the Civil Action at 77–1324, the understanding and agreement was that the matter would be heard before the next available committee meeting of the Western Pennsylvania Committee. The next available committee meeting was on, I think it was January 11 or 12—I am not sure of the date; it was one of those two. On the 9th of January, I got a call from Charles Byrnes of 249, who told me that Mr. Kelly from Custom intended to seek a postponement of consideration of the issue at the January 11 meeting. Mr. Byrnes asked me to call Mr. Kelly about this, and I did call him on January 9, 1978. My reason for calling was to prevail on him not to have this matter continued, and the discussion was pretty heated from my end. I was rather upset that, after having gone through this business of settling the litigation, with the understanding the 249 matter was going to promptly proceed through the grievance procedure, that he wanted a continuance; and he told me his reason for wanting a continuance, as they had a witness who was out of town—I believe he said Florida; I know it was out of town—who could not be there for the meeting, and, if this witness could not testify, he felt that he would be unable to present the case. And I told him that I felt that was contrary to our agreement. We discussed the matter a little further, and it was then agreed between myself and Mr. Kelly that I would not object or I would cause 249 not to object to the continuance of the January consideration of this matter, if the company would agree to immediately submit the matter to final and binding arbitration; and, if the arbitrator wasn't selected by the February meeting of the Western Pennsylvania Committee, we would go ahead with that, but that we wanted to get this matter immediately into arbitration.

\*      \*      \*      \*      \*      \*

I also told Mr. Kelly that, since I had previously dealt with Mr. Knowles, that I would hold off writing to the Federal Mediation and Conciliation Service for a list of arbitrators until he had a chance to advise Mr. Knowles of our discussion, because I felt that, having once dealt with counsel, counsel at least had the right to expect that he would hear what this agreement was before we actually carried it out. I asked Mr. Kelly to contact Mr. Knowles and have Mr. Knowles get back to me, and Mr. Knowles did contact me a couple of weeks later."

Mr. Pasquarelli further testified (Tr. pp. 50–51):

"Q  Subsequent to your writing of the letter on January 9, 1978, did you receive a telephone call from Mr. Knowles, did you say?

A  Yes, I did.

Q  Could you tell us what the substance of that conversation was?

A  He called me to tell me he had heard from Mr. Kelly that I had asked for Mr. Knowles to call; and I then told Mr. Knowles what my discussion with Mr. Kelly was on January 9. I also told Mr. Knowles that I had not yet written for a panel of arbitrators because I didn't want to do until I talked to Mr. Knowles.

Mr. Knowles' response was that he was unaware of what my discussion with Kelly was, but if that is what Mr. Kelly and I agreed to do, then go ahead and write for a panel of arbitrators, which I did."

He went on to state that on January 30, 1978, the Panel of Arbitrators was requested from the Federal Mediation and Concil-

iation Service, but the Panel was not named until the middle of February.

On February 8, 1978, the grievances were presented to the Western Pennsylvania Teamsters and Employers Joint Area Committee (JAC) which was composed of three representatives of both the Union and the Motor Carriers Association. There, the Company raised the question of the timeliness of the grievances, referring primarily to the fact that much more than five days had elapsed from the end of the period when it was scheduled with the JAC by the Union. The Union's position was that the Company had given its word that no procedural issues would be raised. The JAC's decision, filed February 8, 1978, was:

"The Committee was unable to reach a decision on the procedural issue as to whether or not the case is properly before the Committee—deadlocked!"

Immediately, the Union sought arbitration, named its arbitrator and asked the Company to do the same so that the third arbitrator could be selected. The Company replied on March 2nd that the only procedure it would agree to would be submission of the matter to the next step of the grievance procedure, the Eastern Joint Area Conference Committee (EJAC).[3] This was done and a hearing held by the EJAC on April 27, 1978, before which a stipulation was signed by the parties that they would

"submit the dispute to arbitration under the Rules of Procedure prescribed by the Eastern Conference Joint Area Committee, by virtue of its authority, as set forth in Article 46 and 47 of the Supplemental Agreement,"

and that they further agree that

"a majority decision of the Eastern Conference Joint Area Committee in the

---

**3.** Article 46, Section 1, Paragraph (d) provides:

"Deadlocked cases, except those involving discharge, shall be submitted to the Eastern Conference Joint Area Committee for decision. When a case involves a matter of discharge, the Local Union may, within five (5) days of receipt of the notice of deadlock, appeal the matter to arbitration. In the event of arbitration, each side shall within five (5) days of the request name an arbitrator. If the two do not agree upon a neutral within forty-eight (48) hours, the Director of the U.S. Conciliation Service shall be requested to name such neutral. The expense of the neutral, if any, shall be shared equally by the parties. Each party agrees to accept and abide by any award made by the majority of the Arbitration Board so constituted. The Board of Arbitration shall have jurisdiction and authority to interpret, apply or determine the compliance with the provisions of this Agreement, but the Board of Arbitration shall not have jurisdiction or authority to add to, detract from or alter in any way the provisions of this Agreement."

above dispute will be final, conclusive and binding with no appeal and, further, that neither party will attempt through any overt acts, to void the decision rendered."

Again, the Union took the position that there was a commitment to waive any timeliness issue and that the EJAC should proceed to the merits of the discharges, not just the procedural question (Tr. p. 88). The Union also took the position that the matter of the discharges should be in arbitration. On April 27, 1978, the EJAC's decision was that "the Case is untimely filed", thus sustaining the procedural position of the Company.

In the meantime, the Union, on March 24, 1978, filed the request *sub judice* for preliminary injunction. Hearing was scheduled for April 20, 1978, but was held May 8, 1978 because of scheduling problems of the Company's counsel. During the interim, of course, the EJAC decision had been rendered.

## II.

Under the Master Freight Agreement and Teamster's Joint Council No. 40 Freight Division Over-the-Road Supplemental Agreement, there was to be "no strike, lock out, tie-up or other legal proceedings without first using all possible means of a settlement . . . of any controversy which might arise". In the event of any "grievance, complaint or dispute" on the part of an employee, it was:

First, to be reported to the shop steward or committeeman, in writing within seven days, and adjusted within 48 hours, if possible.

Second, failing to agree, the local union was to submit the matter to the JAC on forms provided, filled out to indicate the Article violated, the details of the grievance, the adjustment requested, and "attempt to adjust the same with the Employer within five (5) days."

Third, if the matter could not be so adjusted, it was to be scheduled for hearing by the JAC "in accord with the rules of the Committee, at the next regular meeting of the Committee to hear and adjust the matter". (Where the JAC, by a majority vote, settled a dispute, no appeal could be taken.)

Fourth, deadlocked cases, except those involving discharge, were to be submitted to the EJAC for decision. (When the case involved discharge, the local union could take the matter to arbitration within five days of receipt of the notice of deadlock.)

Additionally, it was provided that in the event of arbitration, each side was to name an arbitrator within five days of the request for arbitration, and that if the two were unable to agree on a neutral arbitrator, the Director of the United States Conciliation Service was to be requested to name such neutral. The Arbitration Board was specifically given "jurisdiction and authority to interpret, apply or determine compliance with the provisions of this Agreement, but the Board of Arbitration shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of this Agreement."

Further, Article 46, Section 1, Paragraph (e) states:

"Where the Joint Area Committee is unable to agree or come to a decision on a case, it shall, at the request of the Union or the Employer involved, be appealed to the Eastern Conference Joint Area Committee at the next *regularly constituted* session. Where any Committee established under the provisions by a majority vote, settles a dispute such decision shall be final and binding on both parties with no further appeal."

The Union takes the position that the Company agreed to arbitration of the discharges. The Company says that the matter is not ripe for arbitration because there was no deadlock regarding the merits of the subject grievance, although it agrees that if there was a deadlock on the merits of the discharges, arbitration would have been the next step, not the EJAC hearing (Tr. p. 77).

The evidence is clear that from the beginning Mr. Pasquarelli, on behalf of the Union, was seeking arbitration and the Company, as Mr. Sandy testified, wanted the Un-

ion to exhaust all remedies within the confines of the labor agreement "before proceeding to arbitration" (Tr. 84).

It is apparent that when the matter was submitted to JAC, which was unable to agree that the grievances were untimely filed, the Union sought arbitration before the tri-partite panel of the Federal Mediation Service and that thereafter, on March 2, 1978, the Company insisted on referral to the EJAC. The Union objected and filed this suit, seeking to compel the Company to engage in arbitration. The Company and the Union appeared before the EJAC although the Union objected to the jurisdiction.

As previously noted, Article 46, Section 1, Paragraph (d) provides for the submission of deadlocked cases, except those involving discharge, to the EJAC; cases involving discharge may be appealed within five days of receipt of the deadlock notice to arbitration. The Article spells out the procedure for selection of the Arbitration Panel and specifies the Panel's jurisdiction and authority.

The Defendant argues that since there was a procedural issue of timeliness involved, the issue, under the contract, had to go to the EJAC and not to arbitration. The short answer is that the contract says when a case involves discharge, the Union may appeal to arbitration. The issue in the case *sub judice* involved discharge and is therefore subject to arbitration. We adopt the Plaintiff's forceful argument that (Plf's Brief pp. 4–5):

"The contract *does not* distinguish between discharge cases that contain possible procedural defenses and those that do not. The paragraph immediately preceding Art. 46, § 1(a) refers to 'any grievance complaint or dispute on the part of any employee' [emphasis added], and the language of Art. 46, § 1(d) clearly refers all deadlocked cases involving discharge *away from the Eastern Conference and directly to a tri-partite board of arbitrators.* Whether or not the grievances were timely filed under the applicable contract language is a procedural defense

(as opposed to a jurisdictional defect) that the *proper review panel* is empowered to decide, since it is a question of procedure which is properly left to the review panel. *John Wiley & Sons v. Livingston,* 367 U.S. 543 [84 S.Ct. 909, 11 L.Ed.2d 898] (1964). However, determining what the proper review panel is, is a question of jurisdiction that this Court must decide. *International Brotherhood of Teamsters, etc. v. Western Pa. Motor Carriers Assn., supra; Bieski v. Eastern Automobile Forwarding Co., Inc.,* 396 F.2d 32 (3rd Cir. 1968). It is submitted that Article 46 clearly reveals that the Eastern Conference was wholly without jurisdiction to hear this matter, since by this clause the parties expressly agreed to submit deadlocked WPJAC cases that involved (i. e. embraced, comprehended, or included) discharge to a tri-partite board of arbitrators. This can be clearly perceived from the plain words of Art. 46, § 1(d), and therefore this court ought not to accept the view that the Eastern Conference has jurisdiction of the matter. *International Brotherhood of Teamsters, etc. v. Western Pa. Motor Carriers Assn., supra; Torrington v. Metal Products Workers Local 1645,* 362 F.2d 677 (2d Cir. 1966)."

Appearance and participation before the EJAC even on the stipulated submission did not constitute a waiver of the Union's position that EJAC had no jurisdiction because the Union raised this at the hearing. *International Brotherhood of Teamsters, Etc. v. W. Pa. Motor Carriers Association,* 574 F.2d 783, 786 (3rd Cir. 1978); *Bakery and Confectionery Workers v. National Biscuit Co.,* 378 F.2d 918, 921 (3rd Cir. 1967). Thus, the submission to EJAC avails the Company no legal merit.

We do not reach any independent finding on the agreement to submit to arbitration as alleged by the Union for this as well will be for the arbitrators. This Court's jurisdiction extends only to the issue of whether the question of discharge was arbitrable under the collective bargaining agreement. As the Supreme Court stated in *United*

*Steelworkers of America v. American Manufacturing,* 363 U.S. 564, 567–8, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403, 1407 (1960):

"The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining *whether the party seeking arbitration is making a claim which on its face is governed by the contract.* Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator." [Emphasis added]

In *Operating Engineers v. Flair Builders,* 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972), the Supreme Court held that because the collective bargaining agreement provided for arbitration of "any difference" between the parties, a claim that a grievance was barred by laches was a question for the arbitrator. The Court expressly rejected the position of the Seventh Circuit Court of Appeals that the arbitrator's jurisdiction reached only "intrinsic" issues of untimeliness, such as those involving compliance with the procedural steps set forth in the collective bargaining agreement. *See also: Controlled Sanitation Corp. v. District 128 of the International Association of Machinists and Aerospace Workers,* 524 F.2d 1324 (3rd Cir. 1975), *cert. den.* 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976) (In employer's action against two unions for damages resulting from an alleged breach of a no-strike clause, the employer contended that judicial proceedings were proper because the union had repudiated the arbitration clause in the collective bargaining agreement. Citing *Flair Builders* and *John Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Third Circuit Court of Appeals upheld the union's contention that whether arbitration had been repudiated was itself a question for arbitration.); *L. O. Koven & Brother, Inc. v. Local Union No. 5767, United Steelworkers of America,* 381 F.2d 196 (3rd Cir. 1967); *Office and Professional Employees International Union, Local No. 9 v. Allied Industrial Workers International Union,* 397 F.Supp. 688 (E.D.Wis.1975), *aff'd.* 535 F.2d 1257 (7th Cir. 1976); *Division 1205, Amalga-*

*mated Transit Union v. Greyhound Lines, Inc.,* 323 F.Supp. 219 (D.Mass.1971) (whether arbitration has been waived by the settlement or alleged settlement of a grievance is a question for arbitration).

The applicable collective bargaining agreement provides in Article 46, Section 1 that the parties will not resort to any strike, lockout, tie-up, or legal proceedings without first using "all possible means of settlement, as provided for in this Agreement, or any controversy which might arise." This language is substantially the same as in the contract in *Flair Builders,* and, therefore, the principles of that case and the other authority cited above must apply. We will enter an appropriate Order requiring compliance with the arbitration provision, and denying Plaintiff's request for counsel fees and for punitive damages since it has failed to show any basis for such award. The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law required by Fed.R.Civ.P. 52.