**PULLMAN, INCORPORATED**

v.

**INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, A.F.L.-C.I.O. et al.**

Civ. A. No. 72–1073.

United States District Court,
E. D. Pennsylvania.

July 17, 1972.

Horace A. Davenport, Norristown, Pa., for plaintiff.

Louis H. Wilderman, Philadelphia, Pa., for defendants.

## MEMORANDUM

GREEN, District Judge.

In this labor dispute, plaintiff-employer, Pullman, Inc. ("Pullman") sought a temporary restraining order against defendant-unions and various union officers compelling union members to return to work. Defendants, in turn, sought to dissolve a state court injunction, issued prior to removal of this case to this Court, which required the workers to return to work. We assumed jurisdiction of the matter under § 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185. In an order dated June 22, 1972, we denied plaintiff's motion

and granted defendants'. Our reasons are now set forth below.

■ The threshold question was whether the collective bargaining agreement ("Agreement") entered into between Pullman and the local union ("Union") on May 19, 1969, was still in effect on May 27, 1972, when the Union employees went on strike. If the Agreement had terminated prior to the strike, an anti-strike injunction would have been prohibited by the Norris-La-Guardia Act, 29 U.S.C. § 104. On the other hand, if the Agreement which contained arbitration and no-strike clauses, continued in effect through May 27, the propriety of an injunction could then be considered under the *Boys Markets* doctrine. Boys Markets, Inc. v. Retail Clerk's Local No. 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). After a hearing on this issue, we concluded that the local union complied with Article XXVI of the Agreement which required written notice of intent to terminate not less than sixty days prior to the Agreement's expiration date, May 18, 1972,[1] and that the Agreement did not renew itself.

The evidence indicating an effective termination of the Agreement is substantial and may be highlighted as follows:

(1) In two letters from the Union to Plaintiff's industrial relations manager, dated January 31, 1972, the Union said:

(a) "This letter is the official notification under Article XXVI 'Term of Agreement' between . . . Pullman, Inc. and the [Union] that the Union desires to make certain changes and revisions in its new Agreement with [Pullman]."

(b) "In order that Local 347 may properly bargain for its members in negotiating the new Agreement with [Pullman], I must receive the following data from you . . . ."

(2) On March 3, 1972, Pullman responded as follows:

"We have received your notice regarding your request to seek revisions in the collective bargaining agreement covering our West Point, Pennsylvania, plant, which is due to expire on May 19, 1972.

"Please be advised that representatives of [Pullman] will meet to begin collective bargaining at a time mutually convenient to the parties."

(3) On May 8, 1972, a representative of Pullman again wrote to the Union:

"On January 31st you sent me a letter requesting certain information which you wanted in order to properly bargain for your members.

"I have attached herewith a copy of the information specified in your Item #1 . . . ."

(4) On May 12, 1972, Pullman filed with the Regional Director of the NLRB a charge against the Union under Section 8(b)(3) of the National Labor Relations Act. Pullman asserted that the Union was not bargaining in good faith because it refused to recognize that delay in negotiations caused by a union representation dispute in April created an allegedly concomitant need for an extension of the negotiating period. Pullman's letter stated in part:

"The respondent union, although requested by the charging party, has refused and still does refuse to either [sic] extend the existing agreement for the sixty-day period as contemplated by section 8(d) of the act as reasonable for meaningful negotiations of a new or modified contract

---

1. ARTICLE XXVI of the Agreement provides as follows:

This Agreement shall be in effect from May 19, 1969 to 11:59 P.M. May 18, 1972, and shall continue in effect from year to year thereafter unless either party hereto gives the other party written notice not less than sixty (60) days prior to such expiration date or the expiration date of any renewal thereof, of its desire to terminate or modify this Agreement. When this Agreement, or any renewal thereof, has been terminated, all rights, duties and obligations created thereunder shall also terminate.

even though the charging party has assured the Union that it will make any benefits negotiated during said sixty-day period retroactive to the stated expiration date of the contract (May 18), but instead has threatened to strike the plant on the aforesaid date, or in the alternative, to negotiate on a day to day basis thereafter at the pleasure of respondent."

(5) On May 18, 1972, Pullman distributed to the Union members a letter which stated that because of the representation dispute in April

" . . . the Company and your Union could not start negotiations until after May 1st. The delay, as well as over one hundred Union contract proposals, has made it impossible to settle the contract by today . . . .

"The company has offered a 60-day extension of the present contract . . . An important part of this Company offer is that all wage increases bargained during this extension would go back to May 19."

■ From the documents summarized above, two conclusions must follow. First, the Union's letters of January 31 clearly reveal an intention on the Union's part to effect termination of the existing contract. In Paterson Parchment Paper Co. v. International Brotherhood of Paper Makers, 191 F.2d 252 (3rd Cir. 1951) cert. denied, 342 U.S. 933, 72 S.Ct. 376, 96 L.Ed. 694 (1952), the Court of Appeals upheld as effective a union termination letter which was more ambiguous than the letter now before us and which likewise did not use the word "terminate." *See also* Baker v. Fleet Maintenance, Inc., 409 F.2d 551 (7th Cir. 1969). Furthermore, by using the words "new agreement" in the January 31 letters, the Union made clear its intent to actually terminate the old contract and negotiate a new one rather than to merely modify the existing contract. This inescapable interpretation of the January 31 letters negates Pull-

man's argument that the letters evidenced only an intent to modify and not to terminate and that the second sentence of Article XXVI permits extinguishment of contract obligations only when the contract is to be terminated and not modified. In any event, we are convinced that Pullman's reading of the Article XXVI, as well as of the letters, is erroneous. The first sentence of Article XXVI indicates that the contract shall not run beyond May 18 if sixty-day notice "to terminate or modify" is given. In other words, the contract is to terminate even if the Union asks only for modification rather than explicitly for termination. The second sentence merely makes clear that the expiration of rights and obligations under the contract coincides with the date of termination of the Agreement, as opposed to the day of notice and that contract rights and obligations will not survive that date. Indeed, line seven of the quoted portion of Pullman's May 12th letter to the NLRB (see page 497, *supra*) indicates that Pullman itself understood that the contract was about to expire regardless of whether a "new *or* modified"[2] contract was to be negotiated.

The second conclusion which flows from the recited documents is that Pullman itself understood the January 31 letters to be notice of termination and that the contract would and did expire on May 18, 1972. Certainly, Pullman's correspondence reveals no objections on its part to the effectiveness of the Union's termination notice.

■ Because there was no contract in effect on May 27, nor on June 22, when we issued our order, there was no arbitration term to enforce by way of injunction under Boys Markets, we were, of course, otherwise prohibited from issuing an injunction by the Norris-LaGuardia Act. In light of this limitation on federal injunctions, we also felt constrained to dissolve the state court's injunction. Our failure to so act would have been "tantamount to issuance of

2. Emphasis added.

that same injunction by the federal court, which . . . would be proscribed by the Norris-LaGuardia Act . . . ." General Electric Co. v. Local Union 191, 413 F.2d 964 (5th Cir. 1969), vacated on other grounds, 398 U.S. 436, 90 S.Ct. 1883, 26 L.Ed.2d 384.

 Plaintiff has argued that the very question of whether or not the contract expired is itself arbitrable and that an injunction, therefore, should be issued. We cannot agree. Determination of the existence of a labor contract or the scope of an arbitration clause is, at the outset, a question for the Court, not the arbitrator. The limits on the presumption of arbitrability is indicated in *Boys Markets* itself:

> "When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect . . . ." 398 U.S. at 254, 90 S.Ct. at 1594. (Emphasis in original).

Some degree of initial judicial scrutiny of the parameters of a labor contract is undoubtedly contemplated. *See* Note, "Labor Injunctions, *Boys Markets*, and the Presumption of Arbitrability," 85 Harv.L.Rev. 636, 639 (1972). And in International Union of Operating Engineers v. Flair Builders, Inc., 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972), the Supreme Court reiterated this position:

> "Of course, nothing we say here diminishes the responsibility of a court to determine whether a union and employer have agreed to arbitration. That issue, as well as the scope of the arbitration clause, remains a matter for judicial decision. See Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962)." 406 U.S. at 491, 92 S.Ct. at 1713, 32 L.Ed.2d at 252.

Determination of a question of contract law, such as duration, which is devoid of any labor law consideration, is uniquely the province of a court rather than of an arbitrator. Thus, in not permitting an arbitrator to decide if there is in fact a contract, we are not contravening the policy considerations which favor arbitration. *See* Note, "Labor Injunctions, *Boys Markets*, and the Presumption of Arbitrability," *supra*, 646.

Accordingly, on June 22, 1972, we entered an order dissolving the Preliminary Injunction entered by the Court of Common Pleas of Montgomery County on May 13, 1972, and denied plaintiff's motion for a Temporary Restraining Order.