Argued and submitted May 7, 1991, decision of Court of Appeals affirmed and order
of the Employment Appeals Board affirmed June 18, 1992

ROSEBURG FOREST PRODUCTS CO.,
*Petitioner on Review,*

*v.*

EMPLOYMENT DIVISION,
Charles G. Jones and all claimants involved in
Referee Decisions 89-S-1380-E, 89-E-1379 and
89-S-1533 who filed timely applications for review,
*Respondents on Review.*

(EAB 89-AB-1080, 89-AB-1081, 89-AB-1082;
CA A62148; SC S37783)

835 P2d 889

Jeffrey M. Batchelor, Portland, argued the cause for petitioner on review. With him on the petition were Nelson D. Atkin II, Scott J. Fortmann, and Lane, Powell, Spears and Lubersky, Portland.

Don S. Willner, Willner & Associates, Portland, argued the cause for respondents on review Charles G. Jones and all claimants involved in Referee Decisions 89-S-1380-E, 89-E-1379, and 89-S-1533 who filed timely applications for review.

No appearance for respondent on review Employment Division.

UNIS, J.

Graber, J., dissented and filed an opinion in which Gillette, J., joined.

## UNIS, J.

The issue presented in this case is whether a collective bargaining agreement (agreement) entered into between International Woodworkers of America, Local 3-3346 (union) and Roseburg Forest Products (employer) was in effect in January 1989, when employer unilaterally reduced the wages of its employees. Resolution of this issue determines whether the employees were entitled to unemployment benefits after going on strike in response to the employer's unilateral reduction in wages. The Employment Appeals Board (EAB) awarded unemployment compensation benefits. The Court of Appeals affirmed. *Roseburg Forest Products Co. v. Employment Div.*, 104 Or App 448, 802 P2d 73 (1990). We affirm.

We take the following undisputed facts from the Court of Appeals' opinion, as supplemented by the information in brackets:

"This case arises from a labor dispute involving the [union] at employer's plant in Roseburg (Plant 3). Employer is a large forest products company. In 1983, employer and [union] signed a collective bargaining agreement that was to be effective from June 1, 1983, to June 1, 1986. * * *

"* * * * *

"In December, 1985, employer and [union] modified the agreement and extended it for two more years, through May 31, 1988. [The agreement contained an automatic renewal clause with separate provisions for changing and terminating the agreement.] On March 28, 1988, more than 60 days, but fewer than 90 days, before June 1, [1988,] employer notified [union] that it intended to revise and amend the agreement. On the same day, [union] notified employer that [union] also wished to amend it. Neither [union] nor employer gave notice of intent to terminate it. On January 5, 1989, the parties agreed that they had bargained to an impasse. On January 10, employer announced that, at the start of the day shift on January 11, [1989,] employer would unilaterally implement its final offer to the union. The new wage scale provided for a reduction in wages and fringe benefits at Plant 3. [Union] announced that it intended to strike and established pickets around Plant 3.

"[Union] members applied for unemployment benefits, but [the Employment] Division denied their applications. [Union] requested a hearing, and the referee affirmed the

denial. The referee found that [Union] members were disqualified under ORS 657.200(1), which provides:

" 'An individual is disqualified for benefits * * * [if] the unemployment of the individual is due to a labor dispute which is in active progress at the * * * establishment * * * at which the individual is or was last employed or at which the individual claims employment rights by union agreement or otherwise.'

"[Union] then sought review by [the] EAB, arguing that its members were eligible for benefits under ORS [657.176(5)]:

" 'An individual shall not be disqualified from receiving benefits * * * [under ORS 657.200] if the individual ceases work or fails to accept work when a collective bargaining agreement between the individual's bargaining unit and the individual's employer is in effect and the employer unilaterally modifies the amount of wages payable under the agreement, in breach of the agreement.'

"[The] EAB reversed the referee's decision and held that employer's * * * notice of intent to revise and amend [given on March 28, 1988,] was insufficient to terminate the agreement between [union] and employer, because, by operation of Article XXIV [of the agreement], the contract had already automatically been renewed and extended to June 1, 1989. [The] EAB concluded that employer had, therefore, unilaterally modified wages payable under the agreement."

*Roseburg Forest Products Co. v. Employment Div., supra,* 104 Or App at 450-51.

■  If employer's unilateral modification of the amount of wages payable under the agreement was a breach of the agreement that was in effect at the time of the strike, then the striking employees are not disqualified from receiving unemployment benefits under ORS 657.200. ORS 657.176(5). If there was no agreement in effect at the time of the strike, or if the employer's unilateral reduction in wages was not a breach of the agreement, then the striking employees are disqualified from receiving unemployment benefits.

ORS 657.282 provides for judicial review of decisions by the EAB "as provided for review of orders in contested cases in ORS 183.310 to 183.550," with an exception concerning the timing of petitions. ORS 183.482(8) provides in part:

"(a)   The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A)   Set aside or modify the order; or

"(B)   Remand the case to the agency for further action under a correct interpretation of the provision of law.

"* * * * *

"(c)   The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

On review, we must determine whether the EAB correctly interpreted the collective bargaining agreement, which turns on a question of law. *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 194, 808 P2d 83 (1991). The EAB determined that the agreement continued in effect after both parties gave notice of desire to change the agreement more than 60 days but less than 90 days prior to June 1, 1988, and then were unable to agree on the changes.

A collective bargaining agreement is one type of contract which, if unambiguous, must be enforced according to its terms. *OSEA v. Rainier School Dist. No. 13, supra*, 311 Or at 194. Employer argues that the plain language of Article XXIV of the agreement prevents the agreement from renewing automatically once notice of desire to change the agreement has been given. Union counters that the plain language of the automatic renewal clause in Article XXIV resulted in the agreement renewing automatically for another year (through June 1, 1989), notwithstanding notice of desire to change the agreement. Union argues that the provisions for changing and terminating the agreement are separate and distinct, and that they operate independently with different consequences.

Article XXIV of the agreement provides:

"This agreement shall be a continuing agreement and shall remain in full force and effect until the first day of June, 1986, and shall remain in full force and effect to each

succeeding June 1 thereafter subject to the following conditions:

"This agreement may be amended or revised at any time by mutual agreement between the parties hereto.

"Either party desiring to change the terms of this agreement shall notify the other party and present the changes desired in writing not less than sixty (60) days prior to June 1, 1986, or any succeeding June 1, and negotiations shall commence within ten (10) days after receipt of such notice by either party.

"Upon completion of negotiations or any or all desired revisions, the agreed-to revisions shall be incorporated into and become a part of this Agreement.

"Either party desiring to terminate this agreement shall notify the other party in writing not less than ninety (90) days prior to June 1 of any year. However, both parties agree to meet in negotiations within ten (10) days after receipt of such notice by either party for purpose of negotiating possible renewal of this Agreement."

■ Employer argues that the phrase "subject to the following conditions" in the first paragraph of Article XXIV means that the agreement does not continue in any form if any of the items listed after that phrase occurs. Therefore, employer suggests, because notice of desire to change the agreement was given, the agreement did not continue in any form even though the notice to change the agreement was given less than the 90 days before June 1 required for notice to terminate the agreement. Union argues that the agreement continued in effect because notice of desire to change the agreement does not serve to terminate it.

Employer's construction of the agreement is contrary to the plain language of the agreement.[1] The fact that

---

[1] Employer is essentially arguing, as does the dissent, that "subject to the following conditions" means "unless." This is illogical. For example, the second paragraph of Article XXIV could have stated: "If the cost of living increases in a given year by more than 10 percent, the base wage under this agreement for the following year will increase by that percentage." Clearly, the agreement would not terminate if this condition occurred. If the cost of living increased in a given year by more than 10 percent, the agreement would continue with the modification in the base wage. If, however, the second paragraph had stated that "if the cost of living increases in a given year by more than 10 percent, this agreement will not be renewed for the following year," then if the condition occurred, the agreement would terminate. If the term "subject to the following conditions" is used, the conditions and their

Article XXIV establishes conditions to which the agreement is subject does not necessarily mean that the occurrence of any of those conditions terminates the agreement altogether. Rather, the opening paragraph — the automatic renewal clause — more accurately means that the agreement will continue in force *in its same form* unless something occurs to change it. If the notice-to-change provision which calls for an amendment is satisfied, the agreement continues as amended; if the notice-to-terminate provision which calls for termination is satisfied, the agreement terminates. It is necessary to consider which of these particular provisions is satisfied in order to determine whether its occurrence changes or affects the continuation of the agreement; the particular provision's placement after the term "subject to" does not *by itself* mean that the agreement terminates if the condition is satisfied.

The message of Article XXIV with its automatic renewal clause is that the agreement shall be a continuing one. Paragraphs 2-4 are written with the assumption that the agreement will continue. Paragraph 2 states that the agreement may be amended or revised at any time by mutual agreement; paragraph 3 gives a specific procedure requiring negotiations toward reaching agreement on changes; paragraph 4 specifies that the "agreed-to revisions" become a part of the continuing agreement. The result is that if timely notice of desire to change the agreement is given and negotiations proceed, "the agreed-to revisions" become a part of the continuing agreement. Conceivably, negotiations could result in the decision that the agreement is satisfactory and need not be changed. A party's invocation of only the specific procedure for changing the agreement does not result in termination of the agreement. Rather, the meaning of paragraphs 2-4 is that the agreement may be changed and that the agreement will continue in its same form subject to "the agreed-to revisions."

The last quoted paragraph of Article XXIV (the notice-to-terminate provision)[2] operates from a different

---

consequences follow. If the term "unless" is used, only the conditions follow, the consequences having already been established.

[2] There is one additional paragraph which appears to be part of Article XXIV

assumption than do the preceding paragraphs. It assumes that, once timely notice of desire to terminate the agreement is given, the agreement will not continue unless the parties negotiate renewal of the agreement. If a party wants to terminate the agreement altogether, the notice-to-terminate provision must be invoked by giving the required timely notice of desire to terminate. The 90-day notice requirement for termination of the agreement is not supplanted by the 60-day notice requirement for changing the agreement; if it were, the 90-day provision would be surplusage. The procedure for changing the agreement can itself only result in changing the agreement, not in terminating it (unless that is the agreed-upon change of the parties). Put another way, any change (including termination of the agreement) resulting from the provisions for changing the agreement in Article XXIV must be by mutual agreement; termination resulting from the provision for terminating the agreement will result unless there is mutual agreement not to terminate (*i.e.*, termination results from unilateral notice of intent to terminate). Here, only timely notice of desire to change the agreement was given, so any change would require mutual agreement. There is no indication that, upon their failure to agree to changes, the parties agreed to terminate the agreement.

Our reading of Article XXIV does not prevent a party to the agreement from attempting to negotiate changes and then, if negotiations do not succeed, giving notice of desire to terminate the agreement. Notice of desire to change the agreement may be given as few as 60 days prior to the automatic renewal date. At that point, if negotiations do not result in satisfactory changes, it is too late to invoke the procedure for terminating the agreement during that contract year. But the notice of desire to change may be given much earlier. That is, notice of desire to change the agreement may be given early enough so that, if the negotiations do not produce satisfactory changes, there are more than 90 days before June 1 of the contract year and the party can still give timely notice of desire to terminate the agreement.

which has not been considered in the arguments of the parties and which does not change our analysis. It provides: "The above provisions notwithstanding, this initial Agreement shall be closed to June 1, 1986."

A collective bargaining agreement "is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 US 574, 578, 80 S Ct 1347, 4 L Ed 2d 1409 (1960). Employer and the dissent argue that employer's interpretation of the contract language is consistent with and dictated by federal labor law, particularly in light of external factors which they use to help interpret the agreement. The interpretation proposed by the employer and by the dissent, however, implies termination even where termination was not intended (*i.e.*, where notice of desire to change was given, and no party intended to do more than modify). Employer's interpretation would force both parties to choose between continuing the current agreement and risking termination of the entire agreement after ineffective negotiations, when only an amendment or revision of the continuing agreement was intended. Further, employer's interpretation would allow the contractual 90-day notice requirement for termination to be circumvented by a 60-day notice of desire to change. In effect, employer's interpretation would, as previously stated, render the 90-day notice-to-terminate provision surplusage.

■ On the other hand, it is entirely consistent with federal labor law to assume, in the interest of labor peace and stability, that in the face of ineffective negotiations to change some terms of the agreement, the party that requested changes would prefer the unmodified agreement to no agreement at all. Even if the parties do prefer no agreement to the unmodified agreement, the mechanism for terminating the agreement is available and allows for negotiations aimed at changing and preserving the agreement.

Some collective bargaining agreements clearly provide that notice of intent to change the agreement does not serve to terminate the agreement. *See, e.g., KCW Furniture, Inc. v. N.L.R.B.*, 634 F2d 436, 437-38 (9th Cir 1980) (interpreting agreement which contained a duration clause which expressly provided that " 'Notice of Opening' is in nowise intended by the parties as a termination of this Agreement * * * nor as forestalling automatic renewal * * *."). Some collective bargaining agreements make it clear that either notice of intent to modify or notice of intent to terminate the

agreement terminates the agreement. *See, e.g., Pullman, Inc. v International Bro. of Boilermakers, Etc.*, 354 F Supp 496, 497 n 1 (ED Pa 1972) (Agreement provided that it "shall continue in effect from year to year thereafter unless either party hereto gives the other party written notice * * * of its desire to terminate or modify this Agreement."). Some collective bargaining agreements make it clear that notice of intent to terminate the agreement can only be sent after notice of intent to modify has been sent and negotiations do not produce agreement. *See, e.g., Labor Board v. Lion Oil Co.*, 352 US 282, 286, 77 S Ct 330, 1 L Ed 2d 331 (1957) (Agreement contained provision for modifying agreement, followed by provision that "[i]f an agreement with respect to amendment of this agreement has not been reached within the [time limit provided], either party may terminate this agreement [by following the specified procedure]."). Some courts have interpreted ambiguous agreements to mean that notice of intent to modify the agreement serves to terminate the agreement; others interpret them to mean that notice of intent to modify the agreement does not serve to terminate the agreement. *See* Annot, 57 ALR Fed 393, 395 (1982) ("[T]he implicit import of the above cases is that any effect that a notice given pursuant to the [National Labor Relations Act] may have on the termination or renewal of a collective bargaining contract must arise from the terms of the contract and not by force of the [National Labor Relations Act]."); Annot, 17 ALR2d 754, 755 (1951) ("It is difficult to formulate general rules for the construction of automatic renewal clauses, since the wording in them varies and must necessarily govern the interpretation which the courts will place on them.").

█     Federal labor law policies and goals, therefore, do not dictate a particular interpretation of the agreement. The parties to an agreement may choose, consistent with fostering labor peace and stability, to provide either that a notice of intent to change does or that it does not serve to terminate the agreement. The key is the language used by the parties in the agreement.

We have analyzed the language of the agreement *ante*, and we have concluded that a notice of desire to change the agreement does not serve to terminate the agreement.

The dissent argues that the plain language of the agreement dictates the opposite conclusion and argues that, if the agreement is ambiguous, the ambiguity should be resolved by resort to a consideration of the practical construction given to the language by the parties.[3] Specifically, the dissent points to a letter from the union which stated that "if no recommended settlement is reached up to and including January 4, 1989 that a legal impasse will be reached." The dissent argues that an impasse can only exist in the absence of a collective bargaining agreement, so the parties must have assumed that the agreement was terminated after the notice of intent to modify was given.

" 'Impasse' is[, however,] an imprecise term of art." *Laborers Tr. Fund v. Advanced Lightweight Conc.*, 484 US 539, 543 n 5, 108 S Ct 830, 98 L Ed 2d 936 (1988) (quoting with approval the Court of Appeals for the Ninth Circuit). The only way that the use of the term "impasse" in the communication between the parties can suggest that the parties understood the agreement to mean that notice of desire to change terminates the agreement is if the parties understood that impasse could only be reached in the absence of an agreement and used the term in that sense. There is no evidence that this is the case; in fact, the employer, while it quotes the union's letter with the term "impasse," does not in its arguments to this court draw significance from the use of that term. The significance of the term is ascribed by the dissent.

It appears that the parties understood the term "impasse" to mean the point at which their negotiations toward changing the agreement had failed, which says nothing about whether or not the agreement was still in existence. It is appropriate to use the term "impasse" in this manner.[4]

---

[3] There is no evidence of the bargaining history of the language in question available in the record.

[4] *See* Gorman, Basic Text on Labor Law — Unionization and Collective Bargaining 463-64 (West 1976), where it is stated:

"When the employer announces an intention to change the status quo on a mandatory subject, [wages, hours and other terms and conditions of employment,] sections 8(a)(5) and 8(d) [of the National Labor Relations Act] do play an important role. On occasion, the employer will accompany its announcement with an offer to the union to bargain; the change in working conditions is made only after the union refuses to bargain or after bargaining has reached an

Parties to an agreement in which the notice of intent to change did not terminate the agreement have used the term "impasse" in this same context, as has the National Labor Relations Board. *KCW Furniture Co.*, 247 NLRB 541, 542, 103 LRRM 1194, *enforced* 634 F2d 436 (9th Cir 1980) ("Having found that the contract automatically renewed itself on April 1, we[, the National Labor Relations Board,] find that Respondent had no right to make unilateral changes in that contract after 'impasse' was reached in the bargaining for a new contract."). It is improper to base an interpretation of the agreement on the parties' use of the term "impasse" by ascribing a particular meaning to the term and then by assuming, in the absence of any evidence suggesting it to be true, that that is what they meant.[5]

■      We conclude that the EAB correctly applied the law in determining that the agreement was not terminated because neither party had given the required timely notice of desire to terminate the agreement and because notice of desire to change the agreement does not operate as notice of desire to terminate the agreement. Under this interpretation,

---

impasse. Whether such a post-impasse change is lawful depends once again upon whether the subject is 'contained in' an existing labor agreement.

"If the subject is 'contained in' the agreement, it is illegal for the employer to alter working conditions in midterm — even if it has given notification to the union and to the appropriate mediation agencies and even if it has bargained to impasse. Section 8(d) clearly affords the union protection for the life of the contract against 'any modification' against its will of provisions which it managed to have expressly embodied in the written agreement. To permit the employer to implement such modifications, after impasse or after a union refusal to bargain on that matter at all, would make a mockery of the directive in section 8(d) that neither party shall be required 'to discuss or agree to' any proposal for midterm modification of 'terms and conditions contained in a contract.' C & S Indus., Inc.[, 158 NLRB 454] (1966) (unlawful to introduce incentive wage plan provisions, even assuming employer first made a sufficient offer to bargain). In short, the employer may modify a term 'contained in' a labor contract only if it secures the consent of the union to do so; it is insufficient that it bargain to impasse with a union which remains intransigent and it is irrelevant that the employer asserts that the modifications are compelled by dire economic necessity. Oak Cliff-Golman Baking Co.[, 207 NLRB 1063] (1974) (midterm wage reductions after notice to and discussions with union)."

[5] There are points of practical construction which also weigh against employer's position. For example, while employer was obligated by the status quo doctrine to maintain the status quo during bargaining, the employer did not do so, but instead continued to follow the terms of the agreement by increasing wages as required by the agreement.

the collective bargaining agreement had automatically been renewed, as the EAB held, and, therefore, was still in effect between the parties at the time of the strike in January 1989, and there is substantial evidence in the record to support EAB's finding that the agreement was breached by the employer's unilateral reduction in wages at that time. Union members were not, therefore, disqualified from receiving unemployment benefits under ORS 657.176(5).

The decision of the Court of Appeals is affirmed. The order of the Employment Appeals Board is affirmed.

**GRABER, J.,** dissenting.

I dissent.

As will be demonstrated below, the Employment Appeals Board erroneously interpreted a provision of law. ORS 657.282; ORS 183.482(8)(a). In addition, its interpretation of the collective bargaining agreement is not supported by substantial evidence in the record. ORS 657.282; ORS 183.482(8)(c). For those reasons, I would reverse the decision of the Court of Appeals and remand the case to the agency for further consideration under a correct interpretation of the law and permissible findings of fact. The parties' timely notices of intent to modify their collective bargaining agreement prevented its automatic renewal, and the parties then bargained to impasse; consequently, the employer's subsequent unilateral modification of wages was not in breach of a collective bargaining agreement that was in effect at the time the affected employees were on strike.

There are two statutory provisions that the agency was called on to construe in this case. ORS 657.200(1) provides:

> "An individual is disqualified for benefits for any week with respect to which the assistant director finds that the unemployment of the individual is due to a labor dispute which is in active progress at the factory, establishment or other premises at which the individual is or was last employed or at which the individual claims employment rights by union agreement or otherwise."

ORS 657.176(5) contains this exception to the disqualification rule stated in ORS 657.200(1):

"An individual shall not be disqualified from receiving benefits * * * under ORS 657.200 if the individual ceases work or fails to accept work when a collective bargaining agreement between the individual's bargaining unit and the individual's employer is in effect and the employer unilaterally modifies the amount of wages payable under the agreement, in breach of the agreement."

In other words, ORS 657.200(1) generally disqualifies from receiving unemployment benefits employees who are on strike; ORS 657.176(5) creates an exception if the employer unilaterally modified the employee's wages in breach of a binding collective bargaining agreement. *See* Senate Committee on Labor, HB 2595, Exhibit J (sponsor described purpose of bill as protecting employees whose employers "forced [them] to forfeit the benefits of the bargain which their representatives have negotiated for them" by cutting their wages "despite the existence of valid labor agreements").

The key questions here are whether the employer's unilateral modification of wages was (1) "in breach of" a collective bargaining agreement (2) that was "in effect" at the time of the strike. ORS 657.176(5). If there was no agreement in effect, or if the change in wages was not a breach of the amount of wages payable thereunder, then striking employees are disqualified from receiving benefits. In my view, there was no agreement in effect; but, even if there was some agreement in effect, it did not include the amount of wages paid under the prior agreement, when wages was the foremost issue that both parties sought to change when they gave timely notice of intent to modify the agreement.

There is a twist to this case. Even though state law governs the conditions under which striking employees may obtain unemployment compensation benefits, state law does not govern the meaning of the parties' collective bargaining agreement. The majority makes a basic analytical mistake by starting its analysis under state labor law principles. The majority cites *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 808 P2d 83 (1991). 313 Or at 305. *OSEA* concerned a matter under the Employment Relations Board's jurisdiction and involved only questions of state law. By contrast, this

case involves parties whose relationship is governed exclusively by federal labor law. *See San Diego Unions v. Garmon*, 359 US 236, 79 S Ct 773, 3 L Ed 2d 775 (1959) (discussing the preemptive effect of the National Labor Relations Act).[1] A discussion of the meaning of the agreement must proceed in that context.

The majority states the facts (313 Or at 303-04) correctly but incompletely. The majority omits the parties' practical interpretation of their collective bargaining agreement. That interpretation is at odds with the majority's.

Among the provisions that the parties expressly sought to revise was the provision concerning wages. The union notified the employer by letter dated March 21, 1988, that "the contracts [which were due to expire on May 31, 1988] are hereby opened for negotiations, revisions or amendments" and listed wages (along with four specific wage proposals) as the first item in a list of 14 items sought to be bargained. The employer's letter to the union of March 28, 1988, also listed wages (along with two specific proposals relating thereto) as item 1 in its desired changes to the collective bargaining agreement. In April 1988, after each party had notified the other that it wished to change the terms of the agreement, the parties began negotiating. They negotiated concerning wages, among other things. By late November 1988, they still had not reached an agreement. The employer notified the union that it would implement its latest offer on December 15. The union asked the employer to wait before implementing that offer and to continue bargaining, and the employer agreed. The union wrote a confirming letter to the employer:

> "[T]his letter will confirm an agreement that we have reached regarding renewal of the 1988 collective bargaining agreement. [The unions] agree that they will continue to bargain in good faith *towards* a mutually acceptable agreement. The parties have expressly agreed that you will immediately rescind your stated implementation of December 15, 1988 and the parties further agree that *if no recommended settlement is reached up to and including January 4, 1989 that a legal impasse will be reached.*" (Emphasis added.)

---

[1] The parties in this case do not dispute that their relationship is governed by federal law.

The parties continued to negotiate but failed to reach an agreement by January 4, 1989. A few days later the employer implemented its last offer, and the union employees went on strike.

By implementing its last offer in January 1989, the employer did "unilaterally modif[y] the amount of wages payable" to the affected employees. ORS 657.176(5). Under the parties' 1987-88 collective bargaining agreement and under applicable principles of federal labor law, however, that modification was not "in breach of the agreement." *Ibid.*

The duration clause of the parties' agreement, Article XXIV, provided:

> "This agreement shall be a continuing agreement and shall remain in full force and effect until the first day of June, 1986, and shall remain in full force and effect to each succeeding June 1 thereafter[2] *subject to the following conditions*:
>
> "This agreement may be amended or revised at any time by mutual agreement between the parties hereto.
>
> "Either party desiring to change the terms of this agreement shall notify the other party and present the changes desired in writing not less than sixty (60) days prior to June 1, 1986, or any succeeding June 1, and negotiations shall commence within ten (10) days after receipt of such notice by either party.
>
> "Upon completion of negotiations or any or all desired revisions, the agreed-to revisions shall be incorporated into and become a part of this Agreement.
>
> "Either party desiring to terminate this agreement shall notify the other party in writing not less than ninety (90) days prior to June 1 of any year. However, both parties agree to meet in negotiations within ten (10) days after receipt of such notice by either party for purpose of negotiating possible renewal of this Agreement." (Emphasis added.)[3]

---

[2] The agreement remained in effect for 1987-88.

[3] Significantly, the agreement did *not* contain a "continuation clause" providing that the agreement would remain in effect during negotiations that follow a notice to amend, until modified by a new agreement. Had the parties intended their agreement to continue while they negotiated the desired amendments, they could have provided for it easily. Such provisions are common in collective bargaining agreements. *See, e.g., International Union of Op. Eng. v. Dahlem Const. Co.*, 193 F2d 470, 473 (6th Cir 1951) ("Should such notice of a desire to modify the terms of this

When read straightforwardly, Article XXIV means that the agreement renews "as is" for one-year intervals each June 1 *unless* a party seeks to modify or terminate the agreement, or unless the parties mutually agree to a change. In any of those events, the agreement does not renew automatically in its existing form.

To state it another way, the duration clause provides that the agreement renews "as is" for one year each June 1 unless one of four situations occurs:

(1)  The parties mutually revise the agreement during its term;

(2)  One party gives timely notice of intent to amend, but no agreement has been reached yet;

(3)  One party gives timely notice of intent to amend, and a new agreement is reached; or

(4)  One party gives timely notice of intent to terminate the agreement altogether.

Each of the four situations is grammatically equivalent, because all four follow the phrase "subject to the following conditions." The one-year renewal of the whole agreement "as is" occurs when a party gives no notice, or untimely notice, under the appropriate paragraph. In situation (2), after the parties give timely notice of intent to change the agreement, then the agreement ceases to be renewed automatically; it expires on May 31; and the parties either can bargain to a new agreement or to impasse — which is what happened here.

In my view, then, the most plausible reading of the duration clause differs from what the majority describes. What the majority demonstrates, however, is that reasonable people can differ about the meaning of the agreement. When a provision in a collective bargaining agreement is ambiguous, there are recognized rules of construction to consider. One of those aids to understanding the parties' intent is their own

---

agreement be given by either party to the other, then this agreement shall remain in full force and effect until modified by a new agreement resulting from the negotiations"); *Paterson v. Parchment P. Co. v. International Brotherhood*, 191 F2d 252, 253 (3d Cir 1951) ("should there be a delay in negotiating the new agreement, this agreement shall remain in full effect until such time as a new agreement is completed"), *cert den* 342 US 933 (1952).

interpretation of the clause at issue. *See Cincinnati Newspaper Guild v. Cincinnati Enquirer*, 863 F2d 439, 443 (6th Cir 1988) (in construing a collective bargaining agreement, "[t]he practical construction placed upon a contract by people who have agreed to be bound by its terms is * * * relevant in determining, should the matter be in doubt, what those terms were supposed to mean").

The parties treated this as an ordinary economic strike. They negotiated *"toward*[] a mutually acceptable agreement" but, instead of reaching an agreement, they bargained *to "legal impasse," as the union itself stated in writing.* (Emphasis added.) An impasse means a situation in which there is no agreement in force; the parties have negotiated in good faith but have not reached a new agreement.

> " 'The definition of an "impasse" is understandable enough — that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless — but its application can be difficult. Given the many factors commonly itemized by the [National Labor Relations] Board and courts in impasse cases, perhaps all that can be said with confidence is that an impasse is a "state of facts in which the parties, despite the best of faith, are simply deadlocked." ' " *Laborers Tr. Fund v. Advanced Lightweight Conc.*, 484 US 539, 543 n 5, 108 S Ct 830, 98 L Ed 2d 936 (1988).

The majority's statement that the parties' characterization of their situation as a "legal impasse" "says *nothing* about whether or not the agreement was still in existence," 313 Or at 311 (emphasis added), is a *non sequitur* given the recognized meaning and effect of "impasse." By definition, there cannot be both an "impasse" in wage negotiations and an agreement in effect concerning wages at the same time. After bargaining to impasse, that is, after good-faith negotiations have exhausted the prospects of concluding an agreement, the employer has a right — as a matter of federal labor law — to implement its last offer. *Ibid.*[4]

---

[4] Footnote 4 (313 Or at 311) illustrates the majority's misreading of the applicable concepts. The text quoted there concerns only a situation in which, *in the middle of the present term covered by an existing collective bargaining agreement*, parties reach a stalemate with respect to proposed changes to the ongoing agreement. The quoted text does not refer to situations, such as the one at issue here, in

In addition to characterizing their situation as a "legal impasse" in correspondence, the parties followed up with the *actions* that one would expect after an impasse and in the absence of a continuing collective bargaining agreement. The employer implemented its last offer, and the union employees went on strike.

At a minimum, these parties treated the provisions of the agreement *that they expressly asked to amend* as not agreed upon and not continued in effect automatically. One of the items not agreed upon was wages. Even if other parts of the agreement continued unchanged under this duration clause, the wage provisions did not.

The majority dismisses the relevance of other courts' interpretations of similar duration clauses, on the ground that they deal with different wording. 313 Or at 309-10.[5] It is true that the specific wording differs from case to case. That is not the end of the inquiry, however. What the majority fails to acknowledge is that other courts' decisions concerning similar clauses also deal with recognized principles of federal labor law, which do bear on this problem.

> "A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts." *Transportation Union v. U.P.R. Co.*, 385 US 157, 160-61, 87 S Ct 369, 17 L Ed 2d 264 (1966).

Collective bargaining agreements are interpreted according to federal law. *Ibid.*; *see also Allis-Chalmers Corp. v. Lueck*, 471 US 202, 210, 105 S Ct 1904, 85 L Ed 2d 206 (1985) (meaning given to terms in collective bargaining agreements must be determined by federal law).

One particularly instructive case is *Kaufman v. Brotherhood of Firemen*, 607 F2d 1104 (5th Cir 1979). The

---

which the present term of the agreement comes to an end and in which the question is whether the agreement renews.

[5] Ironically, the *only* case on which the majority is willing to rely (313 Or at 309, 311-12) is the one that — by the majority's own description of it — is the *least* similar of the federal cases that it cites. In *KCW Furniture, Inc. v. N.L.R.B.*, 634 F2d 436 (9th Cir 1980), the duration clause stated *expressly* that a notice of intent to amend did *not* prevent the automatic renewal of the agreement — wording conspicuously absent from the parties' agreement here.

parties' collective bargaining agreement there stated that it "shall remain in effect until November 12, 1970, and from year to year thereafter with the provision that should either party desire to terminate this Agreement or to modify any part thereof, it shall notify the other party in writing." The union timely requested modifications. Negotiations were unsuccessful. When impasse was reached, the union went on strike. The employer sued for breach of the no-strike clause in the agreement.

The District Court held that a notice to modify the agreement, as distinct from a notice to terminate, did not prevent automatic renewal of the agreement. The District Court reasoned that the agreement created two types of notices, which yielded two different results: notice to terminate the agreement prevented automatic renewal; notice to modify did not. Accordingly, the District Court concluded that the agreement was "in full force and effect" at the time of the strike and that the union had breached the no-strike provision. The District Court's reasoning was similar to the majority's here.

The Fifth Circuit reversed. It agreed with the union's argument that both a notice to terminate and a notice to modify prevented automatic renewal of the agreement. The court first noted that, grammatically, the clause at issue did not give different effect to the two types of notice. Each "serves as a condition or limitation on the extension of the agreement." 607 F2d at 1109. That being so, the court held that the duration clause was unambiguous and had to be read so that notice to modify prevented an automatic renewal of the agreement. *Ibid.*

What is crucial to the present discussion is not so much the Fifth Circuit's insistence on grammatical parity (although that is helpful, too), but its explanation that principles of federal labor law make a contrary result untenable:

> "Collective bargaining agreements are not governed by the common-law principles controlling private contracts, but rather must be construed in light of industrial 'practice, usage and custom pertaining to all such agreements.' * * * Given this awareness for the competing interests of labor and management, the Company's interpretation is untenable. Under the Company's view, the Union would have no

recourse but to accept extension of the present agreement if the parties were unable to agree on modification. The Company would have the unilateral power to reject proposed changes without fear of Union reprisal for its recalcitrance. Indeed, there is nothing in the agreement as interpreted by the Company that would keep it from continuing year after year, thus forcing the Union to choose between termination of the entire agreement and ineffective negotiations. Interpreting the agreement in light of the realities of the bargaining process, it is absurd to construe the duration clause so as to render ineffective the Union's contractual right to seek modifications." *Id.* at 1109-10 (citation omitted).

To similar effect, see *IAM, Dist. Lodge No. 94 v. ILWU, Local 13*, 781 F2d 685, 691 (9th Cir 1986) (notice of desire to modify properly terminates contract).

The majority fails to consider the *function* of the notice of intent to modify. Forcing these parties to terminate their entire agreement, even if only a few changes are desired, to avoid automatic renewal of the agreement "as is" — in the absence of a *clear* expression of that result in the agreement — is not an option that comports with the federal cases on this subject or with their overriding theme of labor peace and stability. Termination of the entire agreement means that both parties must bargain from scratch on every mandatory subject of bargaining, with no bench mark. If that were required in order to prevent automatic renewal of the agreement each year, then the continuity of these parties' labor relationship would be seriously disrupted.

The majority focuses with tunnel vision on the time difference between a 90-day notice to terminate the agreement and a 60-day notice to amend it. 313 Or at 307-09. A notice of desire to modify and a notice of desire to terminate give the parties very different amounts of work ahead of them. Giving them the amount of time appropriate to prepare for the differing tasks is the sole and simple function of the 30-day difference. If the majority were right, then a negotiation for changes after the parties give the 60-day notice could never lead to an impasse, but only to a breach of contract if the employer implemented its last offer.

Even if a party wanted to take the drastic step of terminating the agreement after trying unsuccessfully to

negotiate changes, the majority's reading of Article XXIV effectively prevents a party from doing that. Although the majority notes that the parties can give notice of intent to modify earlier than 60 days, the agreement requires only 60-day notice. It is unlikely that the parties would have provided for so short a modification period had they realized that, by so doing, they would have insufficient time to terminate unacceptable agreements.

The majority's result contradicts the terms of the agreement; it contradicts common sense; it contradicts the parties' characterization of their situation as a "legal impasse" and their actions confirming that characterization; and it contradicts principles of federal labor law. These parties bargained to impasse, not to a collective bargaining agreement, after the expiration of their 1987-88 agreement. Accordingly, the terms of ORS 657.176(5) do not apply. Striking employees were disqualified under ORS 657.200(1), and the Court of Appeals' decision to the contrary should be reversed. The case should be remanded to the Employment Appeals Board for further consideration.

Gillette, J., joins in this dissenting opinion.